Filed 12/23/20  P. v. Curlee CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Petitioner and Respondent,<br><br>v.<br><br>JOEL CURLEE,<br><br>        Defendant and Appellant. | A155574<br><br>(Alameda County<br>Super. Ct. No. 165110) |

Defendant challenges his commitment as a sexually violent predator (SVP) under the Sexually Violent Predator Act (Welf. & Inst. Code, § 6600 et seq. (SVPA)).  First, he argues the trial court erred in allowing a witness to provide detailed testimony regarding the sex offender treatment program (SOTP) at Coalinga State Hospital (CSH).  Second, he argues the trial court erred in admitting hearsay (Evid. Code[1], § 1200) and case-specific hearsay in violation of *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*) and his due process right to confrontation.  Finally, he argues that his trial counsel provided ineffective assistance by failing to object to the admission of the challenged evidence, by failing to object to prosecutorial misconduct in closing argument,

---

[1] All further statutory references are to the Evidence Code unless otherwise stated.

1

and by making an argument in closing that damaged his counsel's credibility. We find there was no reversible error in the admission of testimony regarding the SOTP; defendant forfeited most of his evidentiary and due process challenges by failing to object; there was no prejudicial error in the court's admission of the hearsay to which defendant did object; and defendant fails to meet his burden on his ineffective assistance claims. Accordingly, we affirm.

## I.  BACKGROUND

In 1990, defendant was convicted of robbery, burglary, and rape of a 90-year old woman, and he was paroled in 1999. Defendant was in and out of custody thereafter, imprisoned for burglary in 2002, and transferred to CSH in 2012 where he remained pending an SVP trial.

In 2010, the Alameda County District Attorney filed a petition alleging that defendant was an SVP. A jury found that defendant was an SVP, and the court committed him to the state hospital.

During his trial, defendant was forced to testify against himself, and on appeal, he argued that the trial court violated his right to equal protection because persons found not guilty by reason of insanity (NGI's) could not be forced to testify against themselves at recommitment proceedings. (*People v. Curlee* (2015) 237 Cal.App.4th 709, 712–713.) This court remanded the case for further proceedings and directed the trial court to conduct an evidentiary hearing at which the People would have the opportunity to show that the differential statutory treatment

of SVP's and NGI's was justified.  (*Id.* at p. 722.)  If the trial court found that the People carried their burden, it was to confirm defendant's commitment order, and if it found the People had not carried their burden, it was to conduct a new SVP trial.  (*Id.* at pp. 722–723.)

In 2016, the trial court ordered a new trial to determine whether defendant qualified for commitment as an SVP. The jury found that defendant qualified for SVP commitment, the court committed him to the state hospital for an indeterminate term, and defendant timely appealed.

## A. Witnesses for the People

### 1. Jane Doe

In January 1982, a noise awakened Jane Doe at 3 a.m.  She walked towards the noise and saw a man in the kitchen.  She screamed and tried to run to the front door, but the man grabbed her from behind, and she felt what she believed to be a knife being held to her.  When she screamed, the man punched her in the face and told her to shut up.  Doe stopped screaming because she did not want the man to continue punching her.  She struggled with him, but he was able to pull her towards her bedroom; he pushed her on the floor where she got the knife and pushed it under her bed.  While Doe was on the floor, the man raped her.

### 2. Donald Biasotti

Retired probation officer Donald Biasotti authored a 1982 probation report about defendant.  Defendant had been on

Biasotti's caseload for about three months when defendant was arrested in January 1982. Biasotti interviewed defendant in March 1982 and asked him questions about a statement he had made to another probation officer wherein he admitted taking a purse from, and raping and sodomizing an old woman in 1981. In the same statement, defendant admitted that he took a purse from and raped Jane Doe in January 1982. Defendant confirmed his statement was accurate.

### 3. Dr. Nancy Webber

Psychologist Nancy Webber conducts DSH annual assessments to determine whether a sex offender's condition has changed to the point that he or she can be released into the community. She evaluated defendant in 2015 and 2016 and interviewed him in 2015. Webber opined that community release was not appropriate. One of the most significant factors for her opinion was that defendant had not participated in the SOTP. In 2016, his treatment team recommended ancillary groups and the SOTP, but defendant started only the initial module of SOTP and completed one anger management group. Webber considered defendant's very high score of 8 on the Static-99R, an actuarial tool used to predict the risk of re-offense, which is associated with a relatively high rate of sexual recidivism. Although it is not the correct way to use the Static-99R, Webber also considered that, using defendant's current age instead of his age at the time of release from his last sex offense (33), defendant would score a 6. The five-year and ten-year recidivism rates for a score of six are 25.7 percent and 37.3 percent, respectively. Webber also

considered dynamic factors that have the potential to change and protective factors that reduce people's risk level. Defendant received some protection from his age, but, even then, Webber opined that he should not be released because of his lack of treatment, risk factors, lack of developed release plan, and his poor performance when he was in the community. Webber had no opinion on defendant's risk at the time of the trial.

### 4. Witnesses to CSH Rule Violations

Unit supervisor Serina Robledo testified that defendant incurred a rule violation in August 2014 for putting sheets on his curtains, which both violated the Fire Code and obstructed the view into his room. She testified that, typically, she would write a patient up for that type of behavior if it was a reoccurring offense, and she would have given a warning to a patient prior to writing him up. Senior psychiatric technician Barbara Mendez searched defendant's room in February 2016 and discovered contraband—juice, fruit cups, metal paperclips, and a sharpened metal nail file. Registered nurse Vida Adcock testified that, sometime when she was assigned to defendant's unit, she went to his area at night, and he had a sheet covering his curtains.[2]

---

[2] Adcock testified that she worked on unit 15 where defendant was a patient, and she thought she had worked on the unit for about five years when she testified, but she testified that she could not remember precisely and she may have started on unit 15 in 2016.

### 5. Irene Arenas

Irene Arenas, a senior psychiatric technician at CSH, testified that, in November 2017, a patient told her that he was being bullied and threatened by defendant. Arenas informed the unit supervisor and defendant's treatment team.

### 6. Renee Pierce

Renee Pierce, a unit supervisor on defendant's unit at CSH since September 2017, testified that patients approached her and complained about defendant. Five patients personally approached her, and others approached members of her staff. In one of the complaints to Pierce, two patients reported that defendant "used his torso to propel them further up the stairs" in the stairwell, made some sort of threatening statement suggesting they come into his room, and later walked into their room without invitation. Another complaint was made in the form of a note given to a staff member and involved an alleged threat made by defendant to a patient. Pierce also received a report through Arenas about a threat that defendant made to a patient, and patients alleged that defendant monopolized the TV room. After defendant left CSH for court, staff found clothing contraband in a trashcan while searching another patient, and that patient said defendant had given him the contraband to hold.

After defendant returned from court, they had a team meeting about the incident on the stairs, the threat, and his entering the dorm room. They also discussed the contraband. Defendant acknowledged the clothing contraband was his and

that he had been washing his clothing in the sink instead of through the normal laundry process, but he denied any incidents of bullying or violence. Pierce moved defendant to another area and then off the unit because her unit did not have the staff to observe and determine whether the allegations of bullying were true. She also stated that a patient had started urinating in a makeshift urinal in his bedroom rather than going to the restroom because he feared defendant. On cross examination, Pierce testified that when they transferred defendant, he seemed okay with it, and he was moved to another low risk unit. She confirmed that staff had not seen the incident in the stairwell.

## 7. Dr. Sangil Kwon

Psychologist Sangil Kwon was defendant's treating psychologist for approximately one year ending around September 2017. During that time, defendant was enrolled in a supplemental group he eventually withdrew from called "Men Convicted of Rape." While Kwon supervised defendant, defendant did not enroll in or participate in the core SOTP. Defendant was not "actually genuinely engaged with [his] treatment in general." While he had engaged on an intellectual and cognitive level, for meaningful treatment progress, a deeper emotional level of processing was important, and defendant did not do that. Kwon testified defendant's behavioral issues included peers accusing him of bullying, and she observed defendant hanging out with patients whom staff told her were suspected of drug trafficking. When the treatment team met

7

with defendant to discuss accusations of bullying, he got upset and angry about being accused of such behavior.

## 8. Dr. Mark Patterson

Psychologist Mark Patterson contracted with DSH to conduct SVP evaluations. He first evaluated defendant in 2010 and ultimately assessed him five times. Patterson performed his most recent evaluation in 2018. As part of his evaluation, Patterson updated his prior evaluation from 2017, he reviewed his previous reports, defendant's state hospital and criminal records, and the clinical interview he conducted with defendant in 2017 for approximately three hours. He also obtained collateral information about defendant in 2017 and 2018 through mental health professionals who worked at CSH, including psychologists Sangil Kwon and Eric Kunkel, and defendant's social worker.

Patterson opined that defendant qualified as an SVP. He diagnosed defendant with other specified paraphilic disorder and antisocial personality disorder; he also made a "provisional diagnosis"[3] of substance use disorder for cocaine.

Other specified paraphilic disorder refers to sexually "deviant behavior that has to do with violent or coercive behavior or sadistic behavior directed at a non-consenting person for the

---

[3] Patterson gave a "provisional diagnosis" with respect to a substance use disorder because the severity of defendant's cocaine use was not entirely clear to him; Patterson testified that there was probably enough evidence to make a diagnosis, but he believed that additional information would be useful if it could be obtained.

8

purpose of sexual gratification." The DSM-5[4] does not include this disorder, but it is a qualifying disorder commonly used in practice; the research on sexual deviance recognizes a variety of paraphiliac disorders that have not been fully defined, and one of those relates to coercive sexually violent behavior. Patterson based his diagnosis on the series of violent rapes defendant committed from age 15 to 24, including rapes in 1981, 1982, and 1990. Patterson noted that, while incarcerated for the first two rapes, defendant received sex offender treatment before being paroled. Also significant to Patterson's diagnosis were the considerable level of violence that defendant used during the rapes and his targeting of vulnerable, often elderly, women. For example, defendant had a "rape kit" with rope and a knife for Jane Doe's rape, and, in 1990, he used his elderly victim's cane to threaten her, hook her neck, and pull her across the bed before raping her. Patterson opined that the early onset of defendant's behaviors showed he had an entrenched disorder. There is no cure for other specified paraphilic disorder, but treatments can enable a person to manage his or her behavior; the disease can also go into remission depending on the circumstances of a person's life, and those in custody tend not to display symptoms because the opportunity to act on their behaviors is less readily available.

---

[4] This refers to the Diagnostic and Statistical Manual, Fifth Edition, published by the American Psychiatric Association. The DSM is a manual that helps clinicians focus their diagnostic thinking about what a person is struggling with.

9

Patterson explained that antisocial personality disorder usually begins in adolescence and persists throughout a person's life. It involves a long-standing pattern of violating rules, including laws and social expectations. Those with this disorder often have extensive criminal histories despite prosecution and incarceration. Patterson diagnosed defendant with this disorder because of his early onset of rule breaking and criminal behavior, including substance abuse, burglary, drug sales, and sexual offending, and this behavior extended into adulthood. Defendant also demonstrated a lack of remorse as a juvenile and an adult as evidenced by his criminal behavior and the harm he has caused others. Antisocial personality disorder tends to be chronic, but for many, the criminality aspect tends to diminish in the late thirties or late forties.

Patterson opined that defendant's anti-social personality disorder, combined with his paraphilic disorder, put him at a particularly high risk of reoffending. Substance abuse and antisocial personality disorder can lower impulse or volitional control, and Patterson opined that defendant suffered from a lack of volitional control. To support his opinion, he cited defendant's long criminal history, many parole violations, the difficulty he had getting along with his peers at CSH, and his rule violations at CSH as good evidence of continuing antisocial personality disorder.

To assess defendant's risk of future sexual re-offense, Patterson used reliable actuarial tools, including the Static-99R and Static-2002R. Defendant received a Static-99R score of eight,

placing him in the high risk category.[5] The maximum score is 12 while the minimum is negative three, and defendant's score put him in the 99th percentile of risk for sex offenders. Per the rules for the Static-99R, Patterson scored defendant using his age at the time he was last released for a sexual offense (33) rather than his current age (53), but he considered defendant's current age, although there was no statistically proper way to do so. When considering defendant's age, Patterson considered whether defendant was slowing down in terms of his aggressive or antisocial behavior, but he saw no evidence of significant slowdown. Defendant also scored eight on the Static 2002R, placing him in the well above average category, or in the 95th percentile. Based on this score, his recidivism rate would be expected to be five times higher than the typical sex offender. On cross-examination, Patterson conceded defendant would receive a six on both tests if he had used defendant's current age.

In addition to those included within the Static 99R and Static 2022R instruments, Patterson looked at additional risk factors for defendant. He used the structured Risk Assessment Forensic Version (SRA-FV), a tool that considers dynamic risk factors not fully taken into account with the Static 99R and the

---

[5] Patterson testified that he scored defendant as an eight when he evaluated him originally in 2010. Then, after receiving additional information about defendant's sexual offense history, Patterson scored defendant as a nine in 2012. Patterson testified that he made errors when he neglected to carry the extra point over when he scored defendant as an eight in 2017 and 2018. Scores of eight and nine fall into the highest category of relative risk.

11

Static 2002R.  Defendant's score on the SRA-FV was 3.98, which is above the 3.3 threshold high score.  Research shows that those with high scores on the SRA-FV tend to do less well on probation, parole or conditional release.  They also tend to be more likely to re-offend, especially if they have a history of committing sexual offenses.  Last, Patterson used the Hare Psychopathy Checklist, or the PCL-R, and gave defendant a high score of 30 out of 40.  He explained that a high score is consistent with defendant having antisocial personality disorder, which is relevant to whether defendant is a psychopath and/or he is likely to have impaired volitional control.

Patterson opined that defendant could not be safely treated in the community.  He did not believe that defendant had had sufficient treatment to develop a foundational relapse prevention plan.  Patterson relied on the fact that, while defendant had participated in some groups falling under the umbrella of sex offender treatment at CSH, he elected not to participate in the core SOTP.  According to Patterson, the more willing someone is to engage in the SOTP in an in-patient setting, the more likely that person is to participate in such treatment in an outpatient setting.  Because of defendant's limited engagement in treatment, Patterson opined that he would be less willing to participate in outpatient treatment.  Defendant had also told Patterson that he had decided not to participate in the SOTP, but he believed the groups in which he had participated sufficiently met his needs.  If released into the community, defendant said "he would not need to do anything specific to keep himself from re-offending

sexually[,]" that the treatment he would receive while on parole would be sufficient to meet his treatment needs, and Patterson testified that, while defendant was able to recognize several of his risk factors, he could not identify them all. Further, Patterson opined that defendant had only limited insight or understanding of his issues, including his risk factors, his sexual offense cycle and his triggers, and things that might facilitate his engaging in sexually criminal behavior.

### 9. Dr. Michael Montrief

Michael Montrief, a psychologist at CSH who treated defendant in 2014, testified generally about the SOTP. He stated that, when he treated defendant, defendant was not enrolled in the SOTP or any substance abuse treatment programs, although both were recommended. Defendant took beading and chess classes. Montrief testified that defendant needed to address his anger issues and his paraphilia, and he needed to learn to control his deviant sexual issues. Montrief identified defendant's August 2014 treatment plan, and he testified that defendant's risk of violence was at that time moderate, meaning that if certain circumstances occurred, defendant would resort to violence. Defendant had a hard time controlling behaviors of impulsivity and dangerousness, and he had an act of aggression with a peer, but Montrief did not witness the act. When Montrief counseled defendant regarding other patients' complaints that he was intimidating them, defendant told Montrief that "he would leave people alone if they respected his rights," but that "when

somebody did not respect his rights or try to—he would use violence if he had to."

**10. Dr. Charles Flinton**

Psychologist Charles Flinton, retained by DSH to conduct a psychological evaluation of defendant, did so in 2017 and 2018. He reviewed CSH records, treatment records, evaluations, and defendant's criminal history. In 2017, he interviewed defendant; Flinton also scored defendant using the Static 99R, the Static 2002R, and the PCL-R. Flinton concluded that defendant qualified as an SVP: defendant had a qualifying offense and a mental disorder that predisposed him to commit sexual crimes—namely, antisocial personality disorder, stimulant use disorder, cocaine type, and "other specified paraphilic disorder, a coercion"; he posed a serious risk to the community; and he needed "the level of intensity and custody that is afforded him at the hospital in order to participate [in] and potentially complete treatment."

The paraphilic disorder manifests in defendant becoming sexually aroused by "controlling, dominating, coercing non-consenting partners into sexual activity." This qualifies as a disorder because it caused defendant distress through repeated arrests and incarceration, but he keeps doing it because he cannot stop. Further, defendant pursued this sexual activity when he had a consensual sexual partner. The existence of volitional and emotional impairment was demonstrated because, even in the face of a suffering victim, defendant continued with his actions because he does not control his behavior in response to suffering. Sexual interest develops in adolescence, so the fact

14

that defendant's initial sexual offenses occurred at 15 was significant because it shows the intensity and fixed nature of defendant's desires. Flinton testified that defendant admitted in his interview that he had not been able to control himself and was aroused by the control he had over his victims—an admission Flinton found significant.

Antisocial personality disorder impacts defendant's impulse control and can manifest with aggressiveness, violent behavior, or just general rule breaking behavior. This personality disorder requires evidence of a conduct disorder before the age of 15 and tends to lessen when people get into their forties. When asked if defendant's antisocial personality disorder was active, Flinton said that, in a controlled setting such as CSH, it is difficult to assess whether defendant still has the diagnosis. Flinton noted there were reports of defendant being aggressive in CSH, although he normally follows the rules. Similarly, whether defendant suffered from stimulant use disorder was difficult to say because of his controlled environment, but defendant told Flinton that using cocaine made him crave sex more. Defendant also said he would not commit to abstaining from cocaine. Flinton testified that defendant's mental disorders predispose him to commit violent sexual crimes.

Regarding the risk assessment tools, defendant scored an eight on the Static 99R, placing him "well above average re-offense-wise." On the Static 2002R, defendant scored a nine, also "well above average risk" of reoffending with a recidivism rate of 43.8 percent. For dynamic risk factors, Flinton utilized the SRA-

15

FV, which put defendant in the above-average need group. He also used the Stable 2007, which assesses 13 dynamic risk factors that could change, particularly with treatment. Flinton did not fully score defendant with this tool, but he used the results to determine which areas defendant's treatment should target. Flinton opined that defendant needed some work in almost all of the 13 areas, and he needed treatment to reduce his risk of recidivism. Defendant scored a 30 on the PCL-R, indicating that he suffers from psychopathy. The PCL-R correlates highly with recidivism, including violent sexual recidivism, because it is indicative of a high level of callousness and anti-sociality. Flinton considered protective factors but did not identify any that applied to defendant. If defendant were to reoffend, Flinton believed it would be predatory because of the nature of his past offenses.

As another risk factor, Flinton testified that defendant did not have a developed release plan. When Flinton asked defendant what type of treatment he would participate in if released, defendant said that he "might participate in a [monthly] program at the parole out-patient clinic," but Flinton testified that program has not existed since the early 2000s, which indicated that Defendant had not researched treatment available in the community. While completion of the SOTP could be a protective factor, defendant had not participated.

The basis for Flinton's opinion that it was necessary to keep defendant in custody to ensure the health and safety of others was that defendant was not participating in treatment

16

offered to him at CSH, so Flinton would not expect defendant to participate in treatment in the community. Defendant also had a history of not complying with parole in that he cut off his GPS monitor on parole. Flinton also noted that when he interviewed defendant, defendant admitted that he had not been in control of his cocaine use and using cocaine increased his sex drive. Further, defendant had been released from a state hospital where he had participated in sex offender treatment, and defendant committed another sexual assault thereafter; defendant attributed his offense to being returned to his old environment and not being in control, and, from this, Flinton concluded defendant's prior treatment had not worked. Flinton also testified that defendant had no relapse prevention plan, which is a plan that identifies a person's triggers and the resources from which to seek help.

## 11. Dr. Harry Goldberg

Psychologist Harry Goldberg contracted with DSH and evaluated defendant in 2017. In connection with that evaluation, Goldberg considered various records, he interviewed defendant, and he considered and scored defendant on a number of actuarial tools. In 2018, Goldberg updated his report. Goldberg opined that defendant met the criteria for an SVP. Defendant's 1990 rape conviction qualified as a sexually violent offense. Goldberg diagnosed defendant with "other specified paraphilic disorder[,] nonconsensual sex"; cocaine use disorder, which was in sustained remission given defendant's controlled environment; and other specified personality disorder, antisocial personality. Defendant

admitted to Goldberg that, in 1981 and 1982, he had thoughts of raping his victims before doing so, and Goldberg testified that such urges are consistent with paraphilia. Goldberg also found it significant that defendant had consensual sex available to him when he committed the rapes, and that defendant admitted to another doctor that he liked to control women, and, had his victims consented to sex, he may have gone through with it but would not have found "that feeling of powerfulness." Paraphilia is chronic, and Goldberg opined that defendant still suffers from paraphilic disorder and is "predisposed to commit sexually violent, predatory crimes in the future."

Goldberg further opined that defendant cannot presently control his urges, and he noted there was no evidence that defendant had been successful at not using cocaine while out in the community. Goldberg's personality disorder diagnosis was essentially antisocial personality disorder, but Goldberg lacked evidence of defendant's conduct before 15, which was essential to the antisocial personality disorder diagnosis. After 15, defendant had a history of aggressive crimes, he was known to be threatening at CSH, and Goldberg testified that he made observations from the record of defendant's time at CSH that were consistent with antisocial personality disorder. Goldberg testified that antisocial personality disorder is chronic, but its traits can lessen in severity. Goldberg therefore concluded that it was likely that, without the appropriate treatment and being in custody, defendant would "engage in violent, predatory criminal behaviors as a result of his diagnosed mental disorder[s]."

18

Goldberg initially scored defendant with a seven on the Static-99R but changed it to an eight based on what he characterized as a confusing complication with juvenile offenses. The difference between a seven and an eight is not that significant, as both are well above the average score. Goldberg used the SRA-FV to examine dynamic risk factors, and, based on defendant's SRA-FV score, Goldberg assigned him to the high risk/high needs sample of sex offenders for the purposes of determining a risk rate. On the PCL-R, Goldberg scored defendant with a 27 out of 40, with 30 being the threshold score for psychopathy; thus, while defendant had significant antisocial traits, he was not a psychopath.

Goldberg found the following factors significant to his conclusion that defendant qualified as an SVP: the results of his evaluation with the Static 99R, the SRA-FV, and the PCL-R; that the doctor did not see defendant making much progress at CSH, including his failure to participate in the SOTP and in drug treatment; that defendant had previously received sex offender treatment and had gone on to reoffend; and defendant's statements during their interview. For instance, defendant said he did not believe he had a psychological or sex problem, and the only treatment he needed upon release was "maintenance treatment regarding issues with his mother" which Goldberg explained was not the type of treatment meant to reduce recidivism. Defendant also told Goldberg that he "had no warning signs or triggers because there's no possibility at all he'd ever do this again." Goldberg explained that this was

19

problematic because if defendant does not believe he has a problem, he will not avoid situations that could possibly lead him to commit the same types of crimes.

## B. Witnesses for Defendant

### 1. Dr. Jeremy Coles

Psychologist Jeremy Coles conducted four evaluations of defendant, with the most recent in 2017 per DSH's request. For the 2017 evaluation, Coles reviewed defendant's CSH treatment records and police reports detailing defendant's offenses, and he interviewed defendant for the first time for about an hour and a half. The two discussed defendant's risk factors, and defendant gave what Coles thought was a comprehensive account of what motivated him and how he felt he had changed. Coles believed that defendant had had a paraphilia, but his acting out when he was younger had to do with issues with unresolved aggression, impulsivity, and aggression towards women. Coles believed these factors were no longer present to a level where defendant would act on them.

Coles used the Static-99R, which he opined gives a baseline risk for re-offense but is not the end of the story. Defendant's score on the Static-99R was an eight, but the age variable was based on his age of release for his last sex offense. In defendant's case, that was misleading because his last sex offense was many years ago, and Coles believed it would be more useful to use a current age to account for the diminishing recidivism as people age; with this age, defendant scored a six. Coles did not use the PCL-R because he did not believe that test was particularly good

at predicting sexual recidivism. The factors that underlie the finding of psychopathy, such as aggression, impulsivity, and lack of remorse, are matters that can be talked about in common language without assigning a number. In addition, in defendant's case, many of these factors had changed. The DSH knows that Coles does not use the actuarial instruments that other evaluators use, and it accepts his evaluations.

While Coles believed that defendant had a diagnosed mental disorder—"cocaine use disorder, mild and other specified paraphilic disorder related to coercive sexuality[,]"—he did not believe that defendant still suffered from antisocial personality disorder. Coles had diagnosed defendant with personality disorder with antisocial traits in 2010 and 2012, but antisocial character structures tend to diminish over time. Based on defendant's hospital records, Coles no longer saw evidence of antisocial character structure or aggression. While defendant's prior offenses were predatory, because the factors that contributed to his crimes were no longer present, Coles did not believe that defendant was likely to engage in predatory, sexually violent behavior. Therefore, it was not necessary to keep defendant in custody in a secure facility to ensure the health and safety of the public because he does not present a serious and well-founded risk of reoffending.

On cross examination, Coles admitted that he believed that defendant was engaged in SOTP when he interviewed him, and he only first became aware that defendant refused to do the

21

SOTP that day. He found this problematic but stated it did not change his opinion.

### 2. Dr. Christopher Fisher

Psychologist Christopher Fisher evaluated defendant in 2012 and in 2017; he interviewed defendant both times. For his evaluation, Fisher also reviewed defendant's file from CSH, his prison records and criminal history, and juvenile psych evaluations. He opined that defendant did not qualify as an SVP.

Although Fisher diagnosed defendant with cocaine use disorder, he does not believe that defendant should be "diagnosed with any kind of paraphilia or sexual disorder." He explained that the crimes defendant committed were not the result of such a disorder but were the "result of other factors in his life[.]" While Dr. Fisher had diagnosed defendant with antisocial personality disorder in the past, he opined the condition had gone into remission.

Fisher scored defendant on the Static-99R and the PCL-R. He scored defendant with a six on the former, which translates into a well above average risk of reoffending. To reach this score, Fisher scored defendant in the required categories and then subtracted a point in the age category based on defendant's current age rather than scoring him based upon his age when he was last released from prison for a sexual offense. He believed this was a more accurate and reasonable way of scoring the Static-99R because the purpose of the item is to account for the reduced rate of re-offense that results from aging, and everyone agrees that advancing age is a significant protective factor. Even

the Static-99R developer has debated on how to handle this issue. Fisher testified that, when the Static-99R was developed, developers went with the age when the person was released from confinement for the last sexual offense because it was more convenient, but they have subsequently admitted the spirit of the item is to reflect the person's current age. Fisher claimed it was uncommon to see state evaluators using the age of release when it was as long ago. On the PCL-R, Fisher scored defendant with a 22. A typical person would score somewhere between a two or a four.

Fisher opined that defendant had a diagnosed mental disorder, cocaine use disorder, but that diagnosis is not one that makes him likely to reoffend in a sexually violent and predatory fashion. Further, Fisher considered the risk that defendant would reoffend but concluded that it was not necessary to keep him in a secure facility to ensure the safety of the public.

In 2017, when discussing his prior crimes with Fisher, defendant said that he had felt a sense of power and wanted to feel more powerful and he ended up raping his first victim. He felt even more powerful when he raped his second victim. He referenced his relationship with his mother, and then told Fisher, " 'I just wanted to feel that sense of control. I felt this was a way I could feel total control, to force someone against their will to do what I wanted them to do.' " Fisher asked defendant if he would have had sex with the victims if it was consensual, and defendant said, " 'If it was consensual, I may have gone along with it, but I

still wouldn't have felt like I had done what I set out to do, which was find that feeling of powerfulness.' "

### 3. Dr. Alan Abrams

Psychologist Alan Abrams, who is also licensed to practice law in California, conducted a psychiatric evaluation of defendant at the request of defendant's counsel. In doing so, Abrams reviewed the prior evaluations of defendant prepared by various doctors, as well as state hospital records from CSH; he did not have defendant's prison records. Abrams also interviewed defendant in 2017 for approximately three and a half hours. In his interview, defendant identified anger as an issue, and he was able to talk about how his mother made him feel inadequate which made him angry. Defendant told Abrams that he did not believe he had any mental illnesses.

Abrams testified that, with sex offenders, there are tools that are fairly useful in figuring out where to put the supervisory resources, but there are no tools that have been validated to predict which individual is likely to commit future sexually violent criminal behaviors. He stated that the Static-99R has been misrepresented to the courts as far as a tool that predicts recidivism for sexually violent crimes, but the types of recidivist offenses studied included a variety of offenses, not just sexually violent predatory offenses.

Nonetheless, Abrams used the Static-99R and scored defendant with a five or a six; the variance existed because Abrams did not believe it was possible to reliably determine one of the scoring variables. In calculating the Static-99R score, he

24

used defendant's actual age rather than his age when he was last released from a sex offense because the science supports using the actual age. Abrams stated that an individual with a score of five or six is more likely to commit some kinds of sex offenses, but not necessarily a violent and predatory sexual offense, than a person who scores a three or a four. He also conducted a clinical risk assessment and concluded that defendant's risk was much lower than the score generated by the Static-99R. He did not believe defendant met the statutory requirements for an SVP.

Abrams diagnosed defendant with cocaine use disorder in sustained remission in a controlled environment, current severity absent. He also diagnosed defendant with having suffered parent/child relational problem, child abuse by a parent, high expressed emotion level within his family, adult sexual abuse of a non-partner, problem related to living in a residential institution, problems relating to other legal circumstances (the current proceedings), and he said that defendant probably met the criteria for antisocial personality disorder. For the last diagnosis, he said "probably" because he did not have defendant's juvenile records to discern whether the behavior manifested before the age of 15. Abrams found the cocaine use disorder the most significant; he believed that defendant had matured quite a bit since he last was incarcerated and using cocaine, but defendant had not had a chance to prove sobriety in the community. He considered whether defendant suffered from "other specified paraphilia coercive," but repeatedly characterized people who make this diagnosis as "ideologues."

25

Abrams did not use the PCL-R to evaluate defendant because it was an "unscientific cottage industry." In evaluating defendant's risk, he made a clinical assessment based on his experience which he believes adds to one's ability to understand a person's risk. He also considered the literature addressing the effects of age in recidivism.

Like many people with substance abuse problems, Abrams opined that defendant needs treatment. While he diagnosed defendant with mental disorders, he did not believe that, as a result of those disorders, defendant was likely to engage in sexually violent predatory behavior because defendant did not have a mental disorder that strongly or meaningfully connects him to a risk of committing violent sexual behavior. Abrams conceded there is a highly unlikely chance that, if released, defendant could go on a cocaine binge and commit another rape. That is why defendant needed drug treatment, but that treatment could be done in the community.

## II. DISCUSSION

### A. Dr. Busby's Testimony Regarding the SOTP

Defendant contends the trial court erred by admitting testimony from psychologist Tricia Busby in which she described the details of the SOTP. Although the program was available to defendant, he did not participate, so he argues this information was "completely irrelevant" and should have been excluded under section 350. He adds that the admission of Busby's testimony was prejudicial since it improperly suggested to the jury that if

26

defendant completed the SOTP and was released via the conditional release program, "it would be even safer."

## B. Additional Background

Busby testified that the SOTP model was based on the "Good Lives Model" written by experts Ward and Yates. The prior relapse prevention model was premised on one path to reoffending, whereas the current model assumes multiple pathways and allows for more individualized and effective treatment. Busby testified that research has shown that treatment, and in particular the type used in the SOTP, reduces recidivism. The SOTP uses polygraph assessments, the penile plethysmograph, and a structured risk assessment instrument to determine the patient's treatment needs. At CSH, there is the core SOTP as well as adjunct treatment groups, and the SOTP provides the patient with an intensive look at why he or she committed sexual offenses. It is comprises four modules: Module 1 is generally a 12-week starter module, while module 2 is the core of the program and identifies life goals, a patient's offense progression chain, including trigger identification and developing intervention techniques to prevent re-offense when triggered, victim awareness, and behavioral self-awareness. Module 3 involves the application of skills learned in module 2 and focuses on gathering resources for community release, and module 4 is supervised out-patient treatment in the community. Patients are assessed by and moved through the modules by committees.

Defense counsel objected to the introduction of this testimony, arguing that "a general pitch from Dr. Busby about

the general virtues and operations of this so-called core [SOTP] would be irrelevant as to [defendant]." The trial court overruled this objection, finding Busby's testimony would be probative to the jury in assessing issues in the case that were somewhat complex.

### 1. Legal Authority

Only relevant evidence is admissible. (§ 350.) Relevant evidence is evidence, including evidence relevant to the credibility of witness, that has any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action. (§ 210.) " 'The test of relevance is whether the evidence tends "logically, naturally, and by reasonable inference" to establish material facts [and] . . . [t]he trial court retains broad discretion in determining the relevance of evidence.' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 995, citations omitted.) However, a trial court has no discretion to admit irrelevant evidence. (*People v. Honig* (1996) 48 Cal.App.4th 289, 343.) We apply an abuse of discretion standard to our review of the trial court's evidentiary decisions. (*Cunningham*, at p. 995; *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1449.) Absent a showing of prejudice, however, evidentiary errors are not reversible. (*People v. Hamlin*, at p. 1446; *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

"The SVPA authorizes the involuntary civil commitment of a person who has completed a prison term but is found to be a[n] [SVP]." (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 344.) To establish a person is an SVP, the People

must prove beyond a reasonable doubt: (1) the person has suffered a conviction of at least one qualifying "sexually violent offense," (2) the person has "a diagnosed mental disorder that makes the person a danger to the health and safety of others," and (3) the mental disorder makes it likely the person will engage in future predatory acts of sexually violent criminal behavior if released from custody. (Welf. & Inst. Code, §§ 6600, 6603, 6604; *People v. Shazier* (2014) 60 Cal.4th 109, 126.) "Evidence of the person's amenability to voluntary treatment, if any is presented, is relevant to the ultimate determination whether the person is likely to engage in sexually violent predatory crimes if released from custody." (*People v. Roberge* (2003) 29 Cal.4th 979, 988, fn. 2.) "[I]t would be reasonable to consider the person's refusal to cooperate in any phase of treatment provided by the Department, particularly a period of supervised outpatient treatment in the community, as a sign that the person is not prepared to control his untreated dangerousness by voluntary means if released unconditionally to the community." (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 929 [interpreting section 6601, subd. (d)].)

## 2. Analysis

We find that Dr. Busby's explication of the SOTP was relevant, notwithstanding defendant's failure to participate in it. The description of the available treatment program, along with defendant's refusal to take advantage of it, offered the jury pertinent information to assess the likelihood that he will engage in sexually violent criminal behavior if free in the community.

The program details were also relevant to the opinions of the prosecution's experts. Dr. Patterson opined that defendant could not be safely treated in the community in part because he had not addressed the primary issues one addresses in the SOTP, his failure to participate in the SOTP made him unlikely to seek treatment in the community, defendant did not believe he had any triggers that would facilitate reoffending, and he had not had enough foundational treatment to help him create a relapse prevention plan and learn the skills required to keep from reoffending. Dr. Flinton testified that defendant needed the custody and intensity of CSH in order to participate and potentially complete treatment, and defendant's treatment record was concerning because research shows that those who complete treatment can reduce their recidivism. Dr. Webber opined that defendant was not suitable for release in the community in 2015 and 2016 largely because he had not participated in the SOTP. Further, Dr. Goldberg testified that the fact that defendant did not think he had a sex or psychological problem, he did not think he needed treatment, he had no release plan, and his lack of progress in treatment at CSH were significant to his opinion that defendant qualified as an SVP. The description of the SOTP thus gave the jury a basis for assessing the credibility of the opinions of these experts that defendant would reoffend and could not be safely released.[6]

---

[6] Defendant does not argue that, if relevant, Busby's testimony should have been excluded under section 352.

Even if the trial court erred in admitting Dr. Busby's testimony, it is not reasonably probable the jury would have found that defendant did not qualify as an SVP had Busby not testified. (*Watson*, *supra*, 46 Cal.2d at p. 836.) There is a reasonable probability of a more favorable result when there exists "at least such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error has affected the result." (*Id.* at p. 837.) In this case, there was substantial expert testimony that it would not be safe to release defendant in the community in part because of his refusal to participate in treatment and that defendant qualified as an SVP; defendant had not participated in the SOTP; he minimally participated in other treatment; he did not believe he needed further treatment or that he had any triggers or psychological problems. Moreover, albeit in less detail than Dr. Busby, Dr. Webber testified that the SOTP is a four-module program that defendant had started but had not pursued. Dr. Fisher testified that completion of the SOTP would give defendant a protective factor when assessing the risk of re-offense and allow his release in the community through the conditional release program. Dr. Montrief also testified that stage two of the SOTP was the "meat" of the program where the patient works on the offense progression chain and module four is release in the community when the patient has addressed all aspects of his or her treatment plan. In light of this evidence, there is no reasonable probability that the alleged error of which the defendant complains affected the result. (*Id.* at p. 836.)

## C. Challenges to Testimony Regarding Defendant's Conduct at CSH

Defendant contends the trial court erred in allowing Dr. Patterson, Dr. Coles, Dr. Fisher, Dr. Montrief, Dr. Kwon, Irene Arenas, and Renee Pierce to testify to hearsay or case-specific hearsay conveying details about his behavior at CSH in violation of section 1200 and *Sanchez*, and that such error violated his due process right to confrontation.

Under section 1200, a hearsay statement—one by which a person makes an out-of-court factual assertion and the proponent seeks to rely on the statement to prove that assertion is true—is generally inadmissible unless it falls under a hearsay exception. (§ 1200, subd. (b); *Sanchez, supra*, 63 Cal.4th at p. 674.) In *Sanchez*, applying the hearsay rule to expert testimony, our Supreme Court explained, "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay." (*Sanchez, supra*, 63 Cal.4th at p. 686.) Although "[a]ny expert may still rely on hearsay in forming an opinion, and may tell the jury in general terms that he did so[,] . . .[¶] [w]hat an expert cannot do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id.* at pp. 685–686, italics omitted.) "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Id.* at p. 676.) As a result, hearsay statements

32

containing case-specific facts are admissible only if they either fall under a hearsay exception or are independently proven. (*Ibid.*) Although *Sanchez* is a criminal case, its analysis of the admissibility of expert testimony applies to SVP cases. (*People v. Roa* (2017) 11 Cal.App.5th 428, 433.)

Nonetheless, to challenge inadmissible evidence, an objection must be timely and specific, and the failure to make an appropriate objection forfeits the right to appellate review unless an objection would have been futile. (See § 353, subd. (a).) Respondent contends that defendant forfeited most of his evidentiary objections. While defendant briefly mentions futility, he essentially concedes that he forfeited the majority of these challenges. We agree that defendant forfeited most of his evidentiary challenges.

With the exception of hearsay objections to Arenas's testimony and one part of Pierce's testimony, defense counsel did not object on hearsay, *Sanchez*, or due process grounds to the testimony he now challenges, and the objections he did make were not all timely. Arenas testified that a patient contacted her about defendant in November 2017. When the prosecutor asked what the nature of that contact was, she started to respond, and counsel objected on hearsay grounds. This objection was timely, but counsel's objections to Pierce's testimony were not. In response to the question asking whether a staff member approached Pierce about a patient complaint, Pierce testified, "She did. There was a complaint lodged, a patient had passed her a note, said another patient had—that is associated with

33

[defendant], had apparently given to him that had a threatening statement of some sort on it that he was – that they were going to get him, type of thing." Counsel did not object or move to strike this testimony, and his double hearsay objections thereafter to the prosecution's attempt to elicit more details about the threats came too late. Further, the trial court's ruling regarding Arenas's testimony did not establish the futility of objections to other witnesses' testimony before and after Arenas testified. Defendant preserved only his challenge to Arenas's testimony. (§ 353.)

With respect to Arenas, respondent argues that the trial court properly admitted her testimony for the nonhearsay purpose of explaining her subsequent actions. For this nonhearsay purpose, the court allowed Arenas to testify that a patient told her that he was being bullied and threatened by defendant, so she made a note about the threat in defendant's chart and spoke to his treatment team. A statement offered to prove effect on hearer and to explain the hearer's subsequent actions is not hearsay where " ' "it is the hearer's reaction to the statement that is the relevant fact sought to be proved, not the truth of the matter asserted in the statement." ' " (*People v. Livingston* (2012) 53 Cal.4th 1145, 1162.) The fact that Arenas wrote down that a patient said defendant had threatened him and that she discussed it with his treatment team were not the relevant facts in this SVP trial; rather, the relevant fact would have been that defendant made the threat. The trial court erred in allowing Arenas to relay the hearsay complaint.

34

Nonetheless, evidentiary errors are reversible only when the defendant establishes it is reasonably probable that he would have obtained a more favorable outcome absent the error. (*Watson*, *supra*, 46 Cal.2d at p. 836.)  Defendant argues the admission of this evidence allowed the prosecution to show he continued to engage in antisocial behavior and discredited his experts who believed that he was not currently antisocial and was not likely to commit future sexually violent offenses in part because of his recent behavior, and particularly the testimony of Dr. Coles, who defendant states was likely his strongest witness. Defendant falls far short of establishing the requisite prejudice.

The prosecution's experts testified that antisocial personality disorder has to do with a long-standing pattern of general rule violation, aggressive and impulsive behavior, or not conforming to social norms.  There was unchallenged evidence of defendant's significant history of aggressive crimes and parole and rule violations before CSH.  Patterson opined that defendant's criminal history showed a lack of impulse and volitional control, which is a sign of antisocial disorder, and Goldberg opined that defendant's inability to maintain parole and control his cocaine use also demonstrated his impulsivity. Montrief also testified that defendant had trouble controlling impulsivity and dangerousness.

The patient complaint testified to by Arenas was not the only evidence of defendant's rule-violating behavior at CSH. Instead, the evidence showed that defendant violated CSH rules at least twice by putting a sheet on his curtains; he admitted to

35

Dr. Fisher that he and "his entire dorm" were caught with pruno, although "he wasn't clear who was in possession" of the pruno; defendant was caught with contraband including a sharp metal nail file, fruit cups, juice, and metal paperclips in 2016; defendant had contraband clothing in 2017, and he admitted to violating CSH rules regarding laundering his clothing. The record also includes the unchallenged testimony of Dr. Flinton that there were reports of defendant being aggressive at CSH (though he seemed to generally follow the rules), and of Dr. Goldberg that defendant was known to be aggressive at CSH. Likewise, Montrief testified without objection that when he spoke to defendant regarding other patients' complaints that he was "intimidating them," defendant did not deny the accusations and instead responded that he would engage in violence if he perceived someone as "not respect[ing] his rights."

In addition, Drs. Patterson and Flinton scored defendant with a 30 of 40 on the PCL-R, and Patterson explained a high score is consistent with antisocial personality disorder. Dr. Goldberg scored him with a 27, indicating significant antisocial traits, and Dr. Fisher scored him with a 22, which he considered moderate, but he testified that a typical person would score between a two and a four. Dr. Fisher had diagnosed defendant with antisocial personality disorder in 2012 because of defendant's criminal history and PCL-R score; while he opined the condition had gone into remission in 2017, he did not give details as to why, and he conceded that his 2012 diagnosis was made in part because of defendant's PCL-R score which was the

36

same in 2017.  Defense expert Dr. Abrams also diagnosed defendant with probable antisocial personality disorder, explaining that he used "probable" only because this diagnosis requires evidence of a conduct disorder before the age of 15 and he was missing records on defendant before this age.

Moreover, while the prosecutor attacked Dr. Coles's credibility because he was unaware of 2017 bullying accusations against defendant, that was not her only or even her most significant attack on Dr. Coles.  Instead, the prosecutor highlighted that, despite his purported review of defendant's CSH records, Dr. Coles conceded he was unaware of multiple contraband incidents, and, significantly, up until the day of his trial testimony, Dr. Coles thought defendant was participating in the SOTP and had been unaware that he was not.  Dr Coles conceded on cross-examination that defendant's lack of SOTP participation was problematic.  Dr. Coles also conceded on cross-examination that he had not mentioned defendant's parole violations in his report, and, when he testified defendant did not have the type of serious prison rule violations that linked to antisocial personality disorder, the prosecutor made him concede that defendant's fourteen prison rule violations were one of the factors he had considered in diagnosing defendant with antisocial personality disorder in 2010.  On this record, it is not reasonably probable that, absent Arenas's brief testimony, defendant would have received a more favorable result.

Finally, defendant argues that the admission of the hearsay statement violated his due process right to confrontation.

Defendants in civil SVP proceedings do not have a Sixth Amendment right of confrontation, but they have a due process right of confrontation. (*People v. Otto* (2001) 26 Cal.4th 200, 214.) Assuming without deciding that there was some due process violation and defendant did not forfeit this claim (see *People v. Partida* (2005) 37 Cal.4th 428), on this record and for the same reasons set forth above, we believe that admission of Arenas's brief testimony was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

## D. Ineffective Assistance Related to Evidence of CSH Conduct

Anticipating forfeiture, defendant argues his trial counsel provided ineffective assistance by failing to object to the hearsay and case-specific hearsay.

To establish ineffective assistance, a defendant must show counsel's performance was "deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) A defendant must also show "resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*Ibid*.) A reasonable probability is one sufficient to undermine confidence in the outcome. (*People v. Boyette* (2002) 29 Cal.4th 381, 430.) "Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of

38

reasonable professional assistance.' " (*People v. Lucas* (1995) 12 Cal.4th 415, 436–437.) Failure to object rarely constitutes constitutionally ineffective legal representation as the decision whether to object is inherently tactical. (*People v. Boyette*, at p.424; *People v. Hillhouse* (2002) 27 Cal.4th 469, 502.)

Where the record sheds no light on the purpose behind counsel's acts or omissions, an ineffective assistance claim on direct appeal should be rejected unless counsel was asked for a reason and failed to provide one, or there simply could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) A claim of ineffective assistance is more appropriately resolved by a petition for writ of habeas corpus, which provides the opportunity to present additional evidence regarding the reasons for counsel's acts or omissions. (*Id.* at pp. 266–267.) As we explain below after setting forth the testimony defendant challenges, defendant's ineffective assistance claim fails on direct appeal.

## 1. Additional Background

Before trial, the court addressed the admissibility of documents returned under subpoenas with affidavits from CSH and CDCR custodians of records, including hospital records and special incident reports, police reports, CDCR records, and additional hospital records that had yet to be produced. Trial counsel did not object to psychiatric treatment records, but he objected to CSH special incident and police reports because he believed they were "offered specifically for the purpose of a criminal investigation" and were not part of medical or

39

psychological treatment. The prosecution remarked there was confusion and explained that CSH treatment staff generated serious incident reports in the course of their duties and kept them as medical records whereas the law enforcement agency at CSH generated police reports and returned them under a separate subpoena. Reserving the right to admit documents under sections 1271, 1280, 1560, and 1562, the prosecution agreed to pull out the special incident and police reports to conduct a later admissibility analyses for those she wished to introduce. Ultimately, none of these documents was introduced.

## 2. Dr. Patterson

Seeking to elicit that CSH considered defendant to be a low to moderate risk, defense counsel asked Patterson, "Currently, or for the last couple of years, he's been considered at [CSH] to be a low to moderate risk to other patients or staff; is that right?" Patterson responded, "My recollection of those assessments performed by staff members at the hospital is that they have very—from time to time, depending on when he's being evaluated. So there may have been some periods where with some reference points, he's been considered a low risk to other people there and other times when he's been considered a moderate risk because he has been involved in a series of altercations with other patients."[7] Defense counsel's questioning continued:

---

[7] The word "very" in this quotation may be a court reporter's error; it seems likely that the word used was "varied."

40

"Q. Well, when you say a series of altercations, there's no proof of any violent altercation?
A. It's been documented, yes, there have been.
Q. Somebody complained about him when he was away in court or something?
A. That was one of several complaints that have been documented about [defendant's] aggressive behavior at the hospital."

We do not believe the record affirmatively shows counsel had no rational tactical purpose for his questioning or that there could be none. It is unclear whether defendant challenges the form of the question counsel used to ask about defendant's risk level or the actual decision to ask the question. With respect to the question's form, we reject defendant's claim that counsel did not ask a "yes-no" question when it is clear counsel's question called for a yes or no answer. Regarding the decision to ask the question itself, as defendant concedes, counsel appears to have made a tactical choice to have Patterson concede helpful case-specific facts inadmissible under *Sanchez*. After asking Patterson to do so, counsel could reasonably have decided that objecting to the explanatory part of Patterson's response would undermine the impact of Patterson's concession. Similarly, having questioned Patterson further about the altercations and complaints, counsel could rationally have decided that objecting to the response under *Sanchez* would have been fruitless. (*People v. Bell* (2020) 47 Cal.App.5th 153, 194 ["[T]he testimony about which defendant now complains was elicited by his own counsel. Thus, any [*Sanchez*] error was invited, and defendant may not

challenge that error on appeal"].)[8]  Finally, defense expert Dr. Coles testified that CSH records showed a "lack of aggression for many, many years" on defendant's part, and "[a]ll of the records show[ ] him being very cordial, respectful with peers and staff." Counsel could have rationally decided not to object to Patterson's testimony on *Sanchez* grounds and to instead attack the complaints of aggressiveness as unsubstantiated, in the hopes of avoiding a similar objection from the prosecution when Dr. Coles later related case-specific hearsay supporting his position.

Moreover, defendant fails to show the requisite prejudice for an ineffective assistance claim, as there is no reasonable probability that he would have obtained a more favorable outcome in the absence of counsel's brief questioning of Patterson on this point.  We therefore reject this assertion of ineffective assistance.

### 3.  Dr. Montrief

The prosecution asked Montrief whether defendant had behavioral concerns during Montrief's supervision, and he responded that defendant "ha[d] an act of aggression with another peer."  Additionally, in response to the prosecution's question regarding whether staff raised issues about defendant during the time when Montrief acted as his treating psychologist,

---

[8] Defendant's opening brief, which defines the scope of issues raised in this appeal, argues that defense counsel erred by failing to object to Patterson's responsive testimony describing the complaints, not by asking the follow-up questions.

Montrief testified, "Well, a couple staff said he was difficult. It was just difficult to get compliance from him."

We cannot say there was no plausible tactical reason for counsel's failure to object to this testimony. Montrief conceded that he did not observe the act of aggression; however, he used a document provided by the prosecution to refresh his recollection of when the act occurred, and his testimony did not establish whether the act of aggression was witnessed by other staff. It is possible that CSH records documenting the aggressive act, if properly authenticated and based on personal observation, could have been admitted as business records. (§ 1271, subd. a; *People v. Landau* (2016) 246 Cal.App.4th 850, 872, fn. 7 ["Hospital records, if properly authenticated, are admissible under the business records exception to the hearsay rule. Authentication requires the entries to have been made in the regular course of business, at or near the event and the method and time of preparation tend to indicate the entry's trustworthiness."].) Similarly, had counsel objected to Montrief's testimony regarding defendant's lack of compliance, the prosecution might have called staff members to testify to their personal observations. Because counsel could have made a strategic decision not to object to this brief hearsay testimony to avoid the introduction of non-hearsay that may have further strengthened the People's case, we reject defendant's ineffective assistance claim.

In any case, the defendant cannot show the requisite prejudice for this claim, as there is no reasonable probability he

43

would have obtained a better outcome had his counsel objected to Montrief's testimony.

### 4. Dr. Coles

Dr. Coles diagnosed defendant with antisocial personality disorder in 2010 and 2012, but opined that defendant no longer suffered from this disorder in 2017. He based his conclusion on defendant's CSH records, testifying that he no longer saw evidence of antisocial character structure or aggression therein. On cross-examination, the prosecutor asked Dr. Coles whether he was aware that defendant "was having problems with being accused of bullying other patients in 2017," and whether "he was aware that in 2014 [defendant] had an act of aggression or some type of physical altercation with one of his peers?" Dr. Coles said he was unaware of the former and conceded the latter. Again, defendant's counsel did not object to these questions.

The prosecutor's questions challenging Dr. Coles's opinion contained case-specific hearsay, but we find no ineffective assistance given the state of the law at the time of the trial. *Sanchez* addressed experts relaying case-specific hearsay to support their opinions on direct examination. (*Sanchez, supra,* 63 Cal.4th at p. 686.) On cross-examination, however, " '[i]t is common practice to challenge an expert by inquiring in good faith about relevant information, including hearsay, which he may have overlooked or ignored.' " (*People v. Townsel* (2016) 63 Cal.4th 25, 55–56.) *People v. Malik* (2017) 16 Cal.App.5th 587, 597 (*Malik*), considered whether *Sanchez* applies when a prosecutor cross-examining a defense expert in a criminal case

44

asks impeaching questions that recite testimonial hearsay. As *Malik* observed, the issue is not clear cut. (*Malik*, at p. 597.) On the one hand, a broader range of evidence may be properly used on cross-examination to test and diminish the weight to be given the expert opinion than is admissible on direct examination, but on the other hand, where an expert witness is cross-examined with a question that calls for her or him to confirm a case-specific fact, one may argue that the jury is likely to consider the answer for its truth in contravention of the principles animating *Sanchez*. (*Ibid.*) Ultimately, because the case-specific hearsay in *Malik* was testimonial, the court held that the prosecution's use thereof violated the defendant's Sixth Amendment right to confrontation. (*Id.* at p. 598.)[9] As defendant concedes, *Malik* does not directly address the use of non-testimonial hearsay to impeach an expert in a non-criminal case.

The parties do not cite additional published authority as of the time of defendant's trial addressing the use of case-specific hearsay for impeachment on cross-examination and none addressing the issue in a civil proceeding. Nonetheless, in his leading evidence treatise, our esteemed colleague Justice Simons questions the validity of a blanket rule disallowing the use of case-specific hearsay to impeach an expert. "The *Sanchez* rule barring an expert from relating case-specific hearsay should not be understood to bar cross-examination which seeks to

---

[9] The court ultimately held, however, that any error was harmless beyond a reasonable doubt. (*Mailk, supra,* 16 Cal.App.5th at p. 598.)

45

undermine an expert's opinion by showing that facts relied upon are suspect or that facts inconsistent with the opinion were ignored.  Such cross-examination is permissible, subject to section 352, because the underlying details are introduced to impeach the expert's opinion and not for their truth."  (Simons on California Evidence, § 4.31, citing *People v. Townsel*, *supra*, 63 Cal.4th at pp. 55–56.)  Justice Simons notes that *Malik* may have ignored the distinction between admitting out-of-court statements introduced by the cross-examiner for their truth and using them to impeach the expert, questioning the decision's conclusion that " 'if [the challenged statements in the reports] were not true, the statements would have no impeaching value.  [Citation.]  This seems incorrect:  whether true or not the statements undermine the opinion unless the expert can explain why she ignored them.' "  (Simons on California Evidence, § 4.31.)  Given the uncertain state of the law in this context at the time of the trial, defendant fails to establish that his counsel provided ineffective assistance.  (See *People v. Foster* (2003) 111 Cal.App.4th 379, 385 ["Given that there is no California authority establishing whether or not the questions were proper, defendant cannot establish that counsel's failure to object to the prosecutor's questions in this case 'fell below an objective standard of reasonableness.' "].)

In any event, defendant fails to show the requisite prejudice for an ineffective assistance claim, as there is no reasonable probability that he would have obtained a more favorable outcome in the absence of counsel's brief questioning.

46

### 5. Dr. Fisher

On cross-examination, the prosecutor asked Dr. Fisher, "And [defendant] has historically had a problem with manufacturing and selling pruno while incarcerated, isn't that right?" Fisher replied, "There have been some Pruno production-related issues brought up for [defendant] in the past." The prosecutor continued, "And are you aware of any documentation from the hospital, from Coalinga pertaining to him having been caught with pruno?" Fisher responded, "Yes, there have been allusions to that in the record." On redirect, Fisher elaborated that, in the records he reviewed, defendant had never been found in possession of pruno; pruno was found in the dorm room he shared with three others, but he was never specifically found producing or possessing pruno.

We reject defendant's claim of ineffective assistance pertaining to the cross-examination of Dr. Fisher for the same reason we have rejected his claim with respect to Dr. Coles. Additionally, even if this information had been conveyed during direct examination, there would be no *Sanchez* violation. Dr. Webber testified that defendant admitted to her that he had manufactured pruno in prison to generate income, and Dr. Coles testified that, defendant "told me that he—he and his entire dorm

47

was caught with pruno" at CSH.[10]  Because defendant admitted he had made pruno for sale in prison and that he and his dorm had been caught with pruno at CSH (§ 1220), the prosecution's questioning did result in prejudicial *Sanchez* error.  (*Sanchez*, 63 Cal.4th at p. 686 [expert may not relate as true case-specific facts "unless they are independently proven by competent evidence or are covered by a hearsay exception"]; *People v. Flint* (2018) 22 Cal.App.5th 983, 1000 ["even if the admission of expert testimony reciting as true case-specific hearsay that was independently proven through other witnesses technically constituted error, at most such error would be harmless"].)

## 6. Dr. Kwon

The prosecution asked Kwon what observations she made about defendant when she began interacting with him, and after refreshing her recollection, Kwon immediately answered, "there was some strong suspicion about [defendant] being involved in trafficking drugs or being intoxicated."  When asked further about the issue on direct examination, Kwon explained that she

---

[10] The full sequence of Dr. Coles's testimony is as follows: "Q. So, from reviewing those records, you were aware that in March of 2013, he was caught with contraband; isn't that right? A. I believe he told me that he – he and his entire dorm was caught with pruno.
Q. Okay.  So he admitted to you at some point in your interview that he and his whole dorm was [sic] caught with pruno; is that right?
A. Right.
Q. And was he in possession of the pruno?
A. He wasn't clear who was in possession.  The whole dorm was."

observed defendant with certain patients at meetings, and staff told her those patients were suspected of drug trafficking.

Kwon's testimony regarding what staff told her was hearsay, but we cannot say there was no valid strategy in failing to object. The prosecution's initial question asking Kwon *what she had observed* when she worked with defendant did not call for hearsay. Assuming without deciding that Kwon's response relaying her suspicion that defendant was involved in drug trafficking implicated hearsay, trial counsel, who had presumably seen the document Kwon used to refresh her recollection, could have rationally opted to pursue cross-examination to show that Kwon's suspicion was based merely on defendant's association with others suspected of drug trafficking rather than moving to strike the testimony and risking the jury's speculation about a more damaging scenario. For the same reason, counsel could have opted to forgo objection to the prosecution's questioning eliciting Kwon's more detailed explanation of her suspicion.

### 7. Testimony Regarding Patient Complaints

Defendant challenges his counsel's failure to object to testimony regarding patient complaints about defendant at CSH. Montrief testified that a few patients complained that defendant was intimidating them. Kwon testified that, in 2017, patients complained that defendant was bullying them, and he learned from a patient that the patient felt regularly threatened by defendant. Pierce testified that, in 2017, seven patients complained about defendant, and some claimed that he

49

monopolized the TV room.  Respondent seems to concede this testimony relayed hearsay.

Nonetheless, the record does not show why counsel did not object.  Defendant contends that the complaining witnesses' unavailability and counsel's pretrial objection to the admissibility of CSH police and special incident reports show there was no tactical explanation for counsel's failure to object.  While defendant asserts that the complaining SVP patients were unavailable and he may be correct, it is his burden to show ineffective assistance, and he has not even attempted to provide authority to support his bare assertion.  With respect to CSH special incident and police reports, counsel's pretrial objection was based on the belief that these reports were generated during criminal investigations, so regardless of their content, they would be inadmissible.  We do not think the record affirmatively establishes on appeal that counsel had no tactical reason for his "inherently tactical" (*People v. Hillhouse*, *supra*, 27 Cal.4th at p. 502) decision not to object to the testimony at issue.

Indeed, after Patterson's testimony, it is at least plausible that counsel decided to challenge the peer complaints by showing they were from questionable sources and unsubstantiated.  On cross-examination, Kwon confirmed that, in her experience, patients at CSH made false accusations about peers, defendant was upset after hearing what he said were false accusations, and defendant wanted to be moved to another unit.  Kwon also confirmed that she observed defendant acting appropriately with staff and patients, including when defendant would not have

been aware of her observations. Pierce conceded that she observed defendant behaving in an appropriate manner, the 2017 allegations against him were unsubstantiated, and defendant had been candid about his 2017 contraband violation. Defense counsel highlighted defendant's candor in closing and argued that the bullying allegations against him were unsubstantiated. At the very least, defendant cannot succeed on his claim on direct appeal.

### E. Ineffective Assistance During Closing Arguments

Defendant next asserts that his counsel was ineffective for arguing that predictions made by actuarial statistical tools for a sex offender's risk of re-offense within the five to ten years following release from his or her last sexual offense did not apply to defendant because he had been released from his last sexual offense in 1999 and had not committed a sexual offense since 1990; he also argues ineffective assistance as a result of counsel's failure to object when the People stated in rebuttal closing argument that expert opinion is direct evidence.

#### 1. Additional Background

In his closing argument, defense counsel stated, "Ladies and gentlemen, what I want to tell you is that the government has failed to prove that [defendant] meets criteria as a sexually violent predator. [¶] The actuarial statistical evidence that is the backbone of their case, that is, evidence of other's people's behavior is irrelevant as applied to [defendant]. Because you know and you know almost for certain that the prediction that they make, the prediction that within five years or within 10

51

years after the age of release for [defendant] at 33 years, that there's a certain percentage chance that he's going to re-offend is wrong. You know that it's wrong because—and you know it's irrelevant because you have not had any evidence whatsoever that [defendant] has committed any sort of sexually violent crime since 1990. So no matter what excuses government has that fact is a fact. Those tables don't apply to him because he didn't re-offend within five years or 10 years after the age of 33." Counsel also argued that actuarial instruments are circumstantial, not direct evidence.

In rebuttal closing argument, the prosecution stated, "Now, opposing counsel spent a lot of time talking to you about this idea of direct versus circumstantial evidence and he focused specifically on the Static 99R and his examination of various witnesses about the issues with the Static 99R as they saw them. A couple of points. [¶] These opinions that were given to you by Dr. Flinton, Dr. Patterson, by Dr. Goldberg, their opinion is direct evidence. They rendered the opinion that the respondent met each and every element of the sexually violent predator act and they talked to you about the basis of those opinions. And it wasn't based just on the Static 99R. It was based on their records review, it was based on their interview of the respondent, it was based on them looking at what they found out about him from the PCL-R, from the 2002R, from the SRA-FV and from the Static 99. Numerous tools that provided all sorts of factors tied to the literature that reflect risk for re-offense in the community. All of those factors went [went? Seems like this might be another court

52

reporter error.] into each of those doctor's opinions and they testified about them for why they are of the opinion that respondent right now meets that criteria."

The trial court instructed the jury on evaluating witness credibility (CALCRIM No. 226), conflicting evidence (CALCRIM No. 302), evaluating expert opinions (CALCRIM. No. 332), circumstantial evidence (CALCRIM No. 224), and direct and circumstantial evidence (CALCRIM No. 223).

## 2. Analysis

To establish ineffective assistance of counsel, defendant must show counsel's performance was deficient and resulting prejudice. (*Mai, supra*, 57 Cal.4th at p. 1009.) Without addressing the first prong, we reject defendant's ineffective assistance claims because defendant has not established resulting prejudice. (*People v. Boyette, supra*, 29 Cal.4th at pp. 430–431.)

Defendant contends that his counsel's closing argument opened him up to the government's criticism, and he suffered prejudice because, without this argument, the jury would have found his counsel more reliable. However, defense counsel's comment was brief, Dr. Flinton explained that the Static-99R can be used in a situation such as defendant's where the offender has been in custody for a lengthy period after release from his last sexual offense, and the judge instructed the jury about how to assess attorney misstatements by instructing them that "[i]f either attorney misstates the evidence or the law, you will rely on the evidence as presented in the trial and the law as stated by

me." Moreover, the prosecutor did not argue in rebuttal that defense counsel misunderstood the actuarial tools, nor did the prosecutor comment on counsel's alleged error. Instead, she highlighted that the fact that defendant had not committed a sex crime since 1990 was not a protective factor because he had not been released in the community for more than eighteen months and he did not have access to the elderly victims he preferred. In these circumstances, defendant has not established the probability of a more favorable result sufficient to undermine confidence in the jury's decision. (*People v. Boyette*, *supra*, 29 Cal.4th at p. 430.)

Regarding the failure to object to the prosecution's argument, defendant contends that because there were competing expert opinions, two reasonable inferences could be drawn from this circumstantial evidence—one that the defendant qualifies as an SVP and one that he does not—and the prosecution's statement that expert opinions were direct evidence

prevented the jury from applying CALCRIM No. 224[11] and concluding that defendant was not an SVP.  But the experts called by the People and those called by the defense disagreed on whether defendant had a mental disorder making it likely that he would engage in predatory sexually violent crimes and on whether it was necessary to keep him in custody in a secure facility to ensure the health and safety of others.  In order to draw the inference that defendant did or did not qualify for commitment as an SVP from this evidence, the jury first had to believe one side's experts.  The jury was instructed on evaluating competing expert opinions (CALCRIM No. 332 ["If the expert witnesses disagreed with one another, you should weigh each opinion against the others"]), and conflicting evidence (CALCRIM No. 302 ["if you determine that there is a conflict in the evidence, you must decide what evidence, if any, to believe"]).  The jury's

---

[11] This instruction stated, "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the allegations of the petition have been proved, you must be convinced that the Petitioner has proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to find that the respondent is a sexually violent predator, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the respondent is a sexually violent predator.  If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to a conclusion that the respondent is not a sexually violent predator and another to a conclusion that he is a sexually violent predator, you must accept the  conclusion that he is not a sexually violent predator.  However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

55

finding that defendant was an SVP shows that it resolved the conflict in expert opinions against defendant and found the People's experts credible. It is not reasonably probable that this would have changed had counsel objected to the prosecutor's argument that the expert opinions were direct evidence.

### F. Cumulative Error

Defendant contends that the cumulative impact of the several instances of alleged ineffectiveness, coupled with the admission of hearsay, deprived him of a fair trial. Because defendant has not satisfied his burden of showing that his counsel failed to act as a diligent advocate in this direct appeal, and because we have found any actual or assumed error harmless, we reject defendant's cumulative error claim. (See *People v. Sapp* (2003) 31 Cal.4th 240, 316 ["We have either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial. We reach the same conclusion with respect to the cumulative effect of any assumed errors"].)

## III.   DISPOSITION

The order is affirmed.

BROWN, J.


WE CONCUR:

POLLAK, P. J.

STREETER, J.                              *People v. Curlee* (A155574)

56